Phillip W. ARCE and Paja, Inc., d/b/a
Arce Consultants, Plaintiffs,

v.

COTTON CLUB OF GREENVILLE,
INC., Defendant.

Civ. A. No. 4:94CV169–S–O.

United States District Court,
N.D. Mississippi,
Greenville Division.

April 28, 1995.

Jerome C. Hafter, Shawn N. Sullivan, Lake, Tindall & Thackston, Greenville, MS, for plaintiff.

Gary E. Friedman, William I. Gault, Jr., Phelps Dunbar, L.L.P., Jackson, MS, for defendant.

## MEMORANDUM OPINION DENYING DEFENDANT'S MOTION TO STAY PROCEEDINGS

SENTER, Chief Judge.

This cause of action is before the court on defendant's motion to stay the action and order arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C. §§ 3 and 4.[1]

---

1. Section 3 requires a federal court hearing a case concerning issues which the parties have agreed to arbitrate to stay a trial until arbitration has been completed in accordance with the terms of the agreement. Section 4 of the FAA requires a district court to order the parties "to proceed to arbitration in accordance with the terms of the agreement."

The question before the court is whether an arbitration clause found in the employment agreement between the parties is enforceable pursuant to the FAA, or if it can be revoked by the plaintiffs pursuant to Mississippi common law.

### Facts

On or about February 19, 1993, Matt Walker, acting as president of the defendant, hired Phillip W. Arce as the chief executive officer for the Cotton Club of Greenville. On September 16, 1993, the defendant and the plaintiffs entered into an employment agreement which governed the terms and conditions of employment. Paragraph 14 of the employment agreement provides:

> **14. Arbitration.** Any controversy or claim arising out of or relating to this Agreement or the breach thereof shall be settled by arbitration in accordance with the then governing rules of the American Arbitration Association. The prevailing party shall be entitled to recover all fees and costs of such arbitration from the other party.

On November 16, 1993, the defendant terminated the plaintiffs' employment as its chief executive officer. Plaintiffs filed this cause of action on July 7, 1994, alleging breach of the employment contract, breach of implied covenant of good faith and fair dealing, breach of severance agreement, fraudulent inducement, and defamation.

### Discussion

Section 2 of the Federal Arbitration Act provides:

> A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. "[T]he purpose of [§ 2] was to make arbitration agreements as enforceable as other contracts, but not more so." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 n. 12, 87 S.Ct. 1801, 1806 n. 12, 18 L.Ed.2d 1270 (1967). The defendant argues that the FAA was enacted to specifically supersede the individual states' common law rule allowing revocation of arbitration clauses. The plaintiffs argue that employment contracts are excepted from the FAA, and since they have formally revoked their consent to the arbitration clause, these judicial proceedings cannot be stayed pending arbitration. Section 1 of the FAA states as an exclusion from the statutory definition of commerce the following:

> ... but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.

9 U.S.C. § 1.

If the arbitration clause is not covered by the FAA, then the plaintiffs can void the clause pursuant to state law. The defendant does not dispute this. The Mississippi Supreme Court restated the rule of allowing revocation of arbitration clauses in *McClendon v. Shutt, Olps v. Scanlan*, 237 So.2d 703, (1970) 237 Miss. 703, 115 So.2d 740 (1959).

> ... [A] general agreement, in or collateral to a contract, to submit to final determination by arbitrators the rights and liabilities of the parties with respect to any and all disputes that may thereafter arise under the contract is voidable at will by either party at any time before a valid award is made, and will not be enforced by the courts, because of the rule that private persons cannot, by a contract to arbitrate oust the jurisdiction of the legally constituted courts.

*Id.* 115 So.2d at 741; *see also Standard Millwork & Supply Co. v. Mississippi Steel & Iron Co.*, 205 Miss. 96, 38 So.2d 448, 452 (1949) ("[E]ither party to a written agreement for submission to arbitration has the right to revoke the submission before award is made."); *Jones v. Harris*, 59 Miss. 214, 215 (1881) ("The right of either party to revoke the submission before award made, where the submission is not a rule of court, or regulated by statute changing the common law, is well settled and universally recognized.").

With passage of the FAA, "Congress intended to foreclose state legislative attempts to undercut the enforceability of arbitration agreements." *Southland Corp. v. Keating,* 465 U.S. 1, 11–12, 104 S.Ct. 852, 858–59, 79 L.Ed.2d 1 (1984); *see also Perry v. Thomas,* 482 U.S. 483, 489, 107 S.Ct. 2520, 2525, 96 L.Ed.2d 426 (1987). Prior to the enactment of the FAA, each of the states had differing common law rules allowing a party to a contract to avoid mandatory arbitration of grievances by disavowing the applicable arbitration clause. There was no mechanism to force arbitration. It seems that arbitration was distrusted. No matter the wisdom of continuing this rule, Mississippi's still exists. It is not this court's burden to dispute the continued soundness of the rule, but for Mississippi's Supreme Court or its State Legislature to consider. "[W]e are well past the time when judicial suspicion of the desirability of arbitration and of the competence of arbitral tribunals inhibited the development of arbitration as an alternative means of dispute resolution." *Mitsubishi Motors v. Soler Chrysler–Plymouth,* 473 U.S. 614, 626–27, 105 S.Ct. 3346, 3354, 87 L.Ed.2d 444 (1985). "By agreeing to arbitrate a statutory claim, a party does not forego the substantive rights afforded by the statute; it only submits to their resolution in an arbitral rather than judicial, forum." *Id.* 473 U.S. at 628, 105 S.Ct. at 3354. Considering the caseload in the federal judicial system, this court would prefer to enforce the arbitration clause, but if the FAA does not extend to cover the clause within this employment contract, doing so would be judicial legislation.

There appear to be four steps, broken into two separate categories, which this court must address in considering the arbitration clause. The first two involve the enforceability of the arbitration clause before the court. The other two concern whether the FAA is applicable to this particular employment contract.

The court must determine that a valid agreement to arbitrate exists between the parties and that the specific disputes come within the substantive scope of the agreement. *See Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1114 (3rd Cir.1993). The plaintiffs only argue that the arbitration clause is not enforceable under Mississippi law, not that they were fraudulently coerced into agreeing to the clause. Accordingly, the court finds the arbitration clause valid. Second, the plaintiffs claim breach of the employment contract, breach of implied covenant of good faith, breach of the severance agreement, and fraudulent inducement into the severance agreement. These allegations of the plaintiffs' complaint fall within the scope of the arbitration clause since it extends to "[a]ny controversy or claim arising out of or relating to this Agreement or the breach thereof. . . ." Any question whether the scope of the arbitration clause encompasses the claims, "should be resolved in favor of arbitration." *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983).[2]

Having determined the arbitration clause to be enforceable, the court now must determine whether the plaintiff falls within the class for which the FAA was enacted. The FAA was enacted under the power of Congress to regulate commerce. First, the contract containing the arbitration provision must "evidence a transaction involving commerce." *See Crawford v. West Jersey Health Systems,* 847 F.Supp. 1232, 1240 (D.N.J. 1994). The United States Supreme Court has indicated that Section 2's requirements are met where contractual activity facilitates or affects commerce, even tangentially. *See Prima Paint,* 388 U.S. at 401–02 n. 7, 87 S.Ct. at 1805 n. 7; *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). What is considered to involve interstate commerce has greatly expanded since the enactment of the FAA. The plaintiffs

**2.** Many courts have mistakenly applied the favoritism for arbitration as an instrument for narrowly interpreting the exclusionary language of § 1. Congress enacted the FAA as the articulation of the federal policy for favoring arbitration. It is redundant and inappropriate to use the very policy to assist in the interpretation of its own codification. But it is appropriate, when construing the arbitration provision, to err in favor of the cause of action coming within the scope of the particular arbitration provision. *See Pritzker,* 7 F.3d at 1115.

received salary checks drawn from accounts outside the state of Mississippi and regularly used instruments of interstate commerce, e.g., the United States mail and public telephone lines. *See Bacashihua v. United Postal Serv.*, 859 F.2d 402, 405 (6th Cir.1988) ("the concern ... [is] not whether the individual worker actually engaged in interstate commerce, but whether the class of workers to which the complaining worker belonged engaged in interstate commerce"). As the chief executive of a casino, Phillip Arce's duties involved interstate commerce.

■ The final question the court must address is whether this arbitration clause which is part of the plaintiffs' employment agreement is excluded under § 1. Section 1 expressly excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." The United States Supreme Court has not ruled on the extent to which the exclusionary clause of § 1 is to be construed. In footnote 2 of *Gilmer v. Interstate/Johnson Lane*, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), the Supreme Court noted:

> Section 1 of the FAA provides that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. Several amici curiae in support of Gilmer argue that that section excludes from the coverage of the FAA all "contracts of employment." Gilmer, however, did not raise the issue in the court below, it was not addressed there, and it was not among the questions presented in the petition for certiorari. In any event, it would be inappropriate to address the scope of the § 1 exclusion because the arbitration clause being enforced here is not contained in a contract of employment....we therefore hold that § 1's exclusionary clause does not apply to Gilmer's arbitration agreement. Consequently, we leave for another day the issue raised by amici curiae.

*Id.* 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2, 114 L.Ed.2d at 36 n. 2.

The circuit courts are split over whether the exclusion applies to all employment contracts or only those contracts involving a class of workers actually engaged in interstate commerce. *Compare Miller Brewing Co. v. Brewery Workers Local Union*, 739 F.2d 1159, 1162 (7th Cir.1984) (narrow reading of § 1's exclusionary clause); *Erving v. Virginia Squires Basketball Club*, 468 F.2d 1064, 1069 (2d Cir.1972) (same); *Tenney Engineering, Inc. v. United Electrical Radio & Machine Workers*, 207 F.2d 450 (3rd Cir. 1953) (same); *with Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305 (6th Cir.1991) (adopting broad reading of § 1's exclusionary clause); *United Electrical, Radio & Machine Workers v. Miller Metal Prods.*, 215 F.2d 221, 224 (4th Cir.1954) (declining to adopt a narrow construction because the inclusionary language in section two was intended to exercise the full extent of the commerce power and reading the exclusionary clause using similar language narrowly would be inconsistent).

The Fifth Circuit has not yet had the opportunity to rule upon this issue, but it is aware of the discrepancy in the circuits. In *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir.1991), the appellate court noted in an unnumbered footnote that:

> The FAA's coverage excludes "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." 9 U.S.C. § 1. In both this case and *Gilmer* the arbitration clause was contained in the employee's contract with a securities exchange, not with the employer. *See generally Gilmer*, [500 U.S. at 25 n. 2] 111 S.Ct. at 1651 n. 2 (discussing the exclusionary clause of § 1). Courts should be mindful of this potential issue in future cases.

*Id.* 939 F.2d at 230. Heeding this warning, and not being bound by precedent, the court believes a thorough review of this issue is necessary.

"Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements, notwithstanding any state substantive or procedural policies to the contrary. The effect of the section is to create a body of federal substantive law of arbitrabili-

ty, applicable to any arbitration agreement within the coverage of the Act." *Moses H. Cone Memorial Hospital*, 460 U.S. at 24, 103 S.Ct. at 941. When the policy favoring arbitration was enacted as the FAA, Congress included the section one exclusion. The liberalness of the policy is contradicted to the extent of the exclusion. The plain language of section one controls. Accordingly, the courts should not use the liberal policy favoring arbitration as a principle to ignore or constrict the exclusion of employment contracts from the FAA. "Thus, although Congress passed the FAA to ensure that courts honor the contractual agreement of parties who choose to resolve their disputes by arbitration, it limited the scope of the Act by creating a category of contracts not subject to the Act's strictures." *Willis*, 948 F.2d at 311. To err in favor of arbitration at this second step is to proceed in contravention of the statute's exclusion of employment contracts. *See* Footnote 2.

The section one exclusion is clear and precise—without ambiguity. The court has no need to resort to the legislative history or to rules of statutory construction. Other courts have resorted to such mechanisms, and concluded that Congress intended for the exclusion to apply only to groups of employees actually in the interstate transportation industries. In an effort to distinguish the contrary holdings from this court's reading of section one, the court will explore the use of these mechanisms.

Those courts which have interpreted the exclusion narrowly generally rely upon the holding in *Tenney Engineering v. United Electrical R. & M. Wkrs.*, 207 F.2d 450 (3rd Cir.1953). The *Tenney* court stated:

> We think that the intent of the [section one exclusion] was, under the rule of *ejusdem generis*, to include only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical effect part of it. The draftsmen had in mind the two groups of transportation workers as to which special arbitration legislation already existed and they rounded out the exclusionary clause

by excluding all other similar classes of workers.

*Id.* 207 F.2d at 453. The *Tenney* court concluded that since Congress had specified seamen and railroad employment contracts as excluded from the definition of commerce, then the general phrase "or any other class of workers engaged in foreign or interstate commerce" refers only to other classes of workers who, like the individuals specifically listed, are engaged in the actual movement of goods. The conclusion of this line of logic is that the FAA is applicable to nonunion employment contracts involving workers who are not involved in the transportation industry. *See Hull v. NCR Corp.*, 826 F.Supp. 303, 307 (E.D.Mo.1993); *Management Recruiters Int'l, Inc. v. Nebel*, 765 F.Supp. 419, 421 (N.D.Ohio 1991). Any other arbitration clauses contained in employment contracts do not fall under the enforcement power of the FAA.

*Ejusdem generis* is a rule of statutory construction and literally means: "Of the same kind, class, or nature." Black's Law Dictionary (1983).

> [W]here an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind, as in the case of a "clean-up" phrase, such as the term "otherwise" with respect to a classification which immediately precedes it. . . . [I]t is only a rule of construction to aid in arriving at the true intention of a statute or contract, and never overrules an intention that is clear.

28 C.J.S., 1049–50; *see Morgan v. State*, 208 Miss. 185, 44 So.2d 45, 48 (Miss.1950) ("[T]he purpose of [ejusdem generis's] use is to carry out, not defeat, the legislative intent.").

> The words "other" or "any other" following an enumeration of particular classes are therefore to be read "as other such like", and to include only others of like kind or character. The doctrine of "ejusdem generis", however, is only a rule of construction, to be applied as an aid in ascertaining the legislative intent, and cannot control where the plain purpose and intent of the

Legislature would thereby be hindered or defeated;

*Id.* 44 So.2d at 50.

The congressional record indicates that using *ejusdem generis* as a rule of statutory construction would result in an interpretation contrary to the intent of the drafters.

A review of the legislative history of the FAA confirms that the FAA was never meant to incorporate employment contracts with the requisite effects on interstate commerce within its scope. The Act was originally drafted by a committee of the American Bar Association to overturn a common-law rule which precluded enforcement of agreements to arbitrate in commercial contracts.... At a hearing of the Senate Judiciary Committee, the chairman of the ABA committee responsible for drafting the bill stated that the bill "is not intended [to] be an act referring labor disputes, at all. It is purely an act to give the merchants the right or privilege of sitting down and agreeing with each other as to what their damages are, if they want to do it. Now that is all there is in this."

*Willis,* 948 F.2d at 311 (quoting *Hearings on S. 4213 and S. 4214 Before the Subcomm. on the Judiciary,* 67th Cong. 4th Sess. 9 (1923) (emphasis added)). The record indicates that labor interests were concerned that employees would be forced into arbitration controlled by the employer. The following amendment was proposed by Secretary of Commerce Herbert Hoover in a letter to Senator Thomas Sterling, Chairman of the Senate Subcommittee of the Committee on the Judiciary: "but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in interstate or foreign commerce." *Hearing* at 14. This of course is the § 1 exclusionary clause. On the floor of the House of Representatives, Congressman Graham, Chairman of the House Committee on the Judiciary, in response to questions stated:

This bill simply provides for one thing, and that is to give an opportunity to enforce an agreement in commercial contracts and admiralty contracts—an agreement to arbitrate, when voluntarily placed in the document by the parties to it.

\*   \*   \*   \*   \*   \*

It creates no new legislation; grants no new rights except a remedy to enforce an agreement in commercial contracts and in admiralty contracts.

65 Cong.Rec. 1931 (1924) (emphasis added).

The *Tenney* court stereotyped the legislative history of the FAA as inconclusive. This court's reading of the record indicates that the intent of the exclusion was to clear away any ambiguity that the scope of the FAA extended beyond commercial disputes among merchants.[3] Neither the plain language of § 1 nor its legislative history support the *Tenney* court's characterization of the phrase "any other class of workers" as being limited to only those actually in the transportation industry. The conclusion reached by the *Tenney* court and its prodigy results in segregating employees who may have identical arbitration clauses within their employment contracts into those who must arbitrate and those who can choose to ignore an arbitration provision. This court does not read the FAA to provide for the selective enforcement of arbitration clauses which appear in employment contracts. The FAA as written does not provide for such, nor does its congressional history indicate such an intent.

Additionally, *Tenney* and those courts which have adopted the "actual transportation" interpretation of § 1, draw the conclusion that since the power of Congress to regulate interstate business pursuant to the commerce clause was very narrow at the time the FAA was enacted, then the "engaging in commerce" exclusion language should be narrowly interpreted. First, it is illogical on the one hand to view the § 1 phrase "engaging in commerce" narrowly, but on the other hand to have allowed the phrase "in-

---

**3.** The power of the FAA to enforce arbitration clauses, even excluding those in employment contracts, has been extended beyond mere commercial disputes. This court does not sit to define the parameters of the FAA as to noncommer-

cial nonemployment arbitration clauses, but only to determine its application to the arbitration clause *sub judice* which is contained within an employment contract.

volving commerce" in § 2 to expand with the growth of Congress's regulatory power under the commerce clause. This has resulted in more business activities being construed as "involving commerce", and thus falling under the power of the FAA, but no more are excluded than those who actually engage in transportation. The meanings of the phrases "involving commerce" and "engaging commerce" should not be interpreted so differently. Second, interpreting the exclusion clause narrowly results in expanding the power to enforce arbitration provisions otherwise not intended to be within the scope of the FAA. Finally, interstate commerce at the time the FAA was enacted was generally understood to be limited to maritime and railroad transactions. Thus, when Congress excluded employment contracts of maritime and railroad workers, it resulted in voiding the power to enforce · arbitration clauses of most employment contracts. With the addition of the catch-all phrase "or any other class of worker engaged in foreign or interstate commerce," all employment contracts would have been excluded from the arbitration enforcement power of the FAA. Interpreting the exclusion phrase "engaging in commerce" as broadly as the empowering phrase "involving commerce" does not result in neutralizing the FAA, as some courts have argued. What results is a mechanism for enforcement of arbitration clauses which are in any contract involving commerce, except for arbitration clauses which appear in employment contracts. It is noted that several courts state that if it truly was the intent of Congress to exclude all employment contracts then it easily could have written a clearer exclusion. Certainly, the exclusion could be more succinct, but the failure of Congress to have done so seventy years ago, does not justify the judiciary construing intentions beyond what was enacted.

Two sister district courts within the Fifth Circuit have issued opinions that follow the cases which restrict the exclusionary clause to employees who actually transport goods in interstate commerce. This court respectfully disagrees with their interpretation of § 1. In *ITT Consumer Financial Corp. v. Wilson, et al.*, S91–0242(G), slip op., 1991 WL 494536 (S.D.Miss. Nov. 25, 1991), the court summari-

ly accepted the holding of *Tenney*, and concluded that since the employment contract containing the arbitration provision was not within a collective bargaining instrument, and the defendants were not involved in the transportation industry, then § 1 did not prevent the district court from enjoining the state court action and compelling arbitration. As discussed earlier, the *Tenney* court reached an erroneous conclusion.

In *Hampton v. ITT Corp.*, 829 F.Supp. 202 (S.D.Tex.1993), the district court accepted the "actually in the transportation industries" constriction of § 1, since the United States Supreme court had announced a policy favoring arbitration in *Mercury Construction Corp.*, and *Gilmer.*

> The court finds these authorities consistent with the Supreme Court's instruction that arbitration is to be favored, [ ], and with the Supreme Court's express refusal in *Gilmer* to adopt the expansive interpretation of section 1 that plaintiffs seek.

Again, the statute is the enactment of the policy. Only when determining whether the arbitration clause of the contract covers the dispute between the parties is the court to err on the side of finding arbitration. Finally, the *Gilmer* court in footnote 2 excepted from its decision any consideration of the extent of § 1's exclusionary language.

Accordingly, this court does not follow the line of cases interpreting the exclusion clause of 9 U.S.C. § 1 to apply only to those class of employees actually engaged in the movement of goods in foreign or interstate commerce. The arbitration clause *sub judice*, being part of an employment agreement, is excluded from the enforcement power of the Federal Arbitration Act. Since the common law of Mississippi controls this diversity case, the plaintiffs can disregard the arbitration clause. The defendant's motion to stay this action pending arbitration is not well taken. An order in accordance with this memorandum opinion shall be issued.

### ORDER DENYING DEFENDANT'S MOTION TO STAY PROCEEDINGS

In accordance with a memorandum opinion issued concurrently, IT IS ORDERED:

That the defendant's motion to stay proceedings is denied.

SO ORDERED this 27th day of April, 1995.