**Kathleen SCOTT, Plaintiff,**

v.

**FARM FAMILY LIFE INSURANCE CO. and Philip P. Weber, Defendants.**

**Civ. A. No. 92–12774–T.**

United States District Court, D. Massachusetts.

July 27, 1993.

Loretta T. Attardo, Salem, MA, for plaintiff.

Scott C. Moriearty, Bingham, Dana & Gould, Boston, MA, for defendants.

### *MEMORANDUM*

TAURO, Chief Judge.

Plaintiff, Kathleen Scott, sues her former employer, Farm Family Life Insurance Co. ("Farm Family"), and Philip Weber, President of Farm Family, alleging improper employment termination.

Presently before the court is defendants' motion to dismiss or to stay the action pending arbitration.

## I

### Background

In April 1986, Farm Family hired Scott as an insurance sales agent. At that time, Scott signed an "Agent Contract" which provided that "all disputes arising under this agreement ... shall be resolved by binding arbitration pursuant to the rules of the American Arbitration Association." Scott renewed this contract on August 22, 1988.

Scott, who was not married, alleges that in January 1988, she informed her manager, Thomas Hajadsz, that she was pregnant. She contends that Farm Family, through its agents and employees, including Weber, instructed Hajadsz to discharge Scott, or seek her resignation, due to her status as an unmarried, pregnant woman. Scott claims that Hajadsz refused to take any action against her and, as a result, was himself terminated.

Scott further claims that, throughout her employment, Weber repeatedly referred to her as "that fat broad" and "that slut." Weber also purportedly made frequent comments about the sexual activities of Scott and other female employees.

In September 1989, Weber terminated Scott's employment. Scott contends that, at the time of her discharge, there were five sales agents who ranked lower than she did in sales production. She further alleges that Farm Family hired a man to replace her.

Scott filed a timely sex discrimination charge with the Massachusetts Commission Against Discrimination ("MCAD") on March 22, 1990. The MCAD failed to docket her complaint or take any action until October 16, 1992, when it issued a Right to Sue letter.

In her complaint, Scott alleges that defendants discriminated against her on the basis of her sex, marital status and pregnancy in violation of Title VII, 42 U.S.C. § 2000e, and Mass.Gen.L. ch. 151B, § 4. Scott further alleges claims of sexual harassment in violation of Mass.Gen.L. ch. 214, § 1C; intention-

al interference with contractual relations; breach of contract; violation of the Massachusetts Equal Rights Act, Mass.Gen.L. ch. 93, § 102; violation of the Massachusetts Civil Rights Act, Mass.Gen.L. ch. 12, §§ 11H, 11I; and intentional and negligent infliction of emotional distress.

## II

### Analysis

Defendants argue that Scott's Agent Contract mandates that all of her claims be resolved by arbitration. *See Gilmer v. Interstate/Johnson Lane Corp.*, — U.S. —, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991) (holding that employment discrimination claims are appropriate for arbitration). On this basis, defendants contend that this action should be dismissed or stayed pending arbitration.

### A. § 1 exclusion to the FAA

The Federal Arbitration Act ("FAA") provides that "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable...." 9 U.S.C. § 2. The statute defines "commerce" as:

> commerce among the several States or with foreign nations, or in any Territory of the United States or in the District of Columbia, or between any such Territory and another, or between any such Territory and any State or foreign nation, or between the District of Columbia and any State or Territory or foreign nation, *but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.*

9 U.S.C. § 1 (emphasis added). Scott contends that her Agent Contract should be excluded from the FAA's arbitration requirement, because it is a "contract[ ] of employment of ... [a] worker[ ] engaged in foreign or interstate commerce."

The First Circuit has narrowly construed the § 1 exclusion of "contracts of employment of ... workers engaged in foreign or

interstate commerce" as limited to those employees "involved in or closely related to the actual movement of goods in interstate commerce." *Dickstein v. duPont*, 443 F.2d 783, 785 (1st Cir.1971). *See also Corion Corp. v. Chen*, 1991 WL 280288 1991 U.S.Dist. LEXIS 18395, *12 (D.Mass. Dec. 27, 1991) (finding that a manufacturing manager involved in the placement of goods in the stream of commerce was not involved in the actual movement of goods in interstate commerce).

Scott argues that the § 1 exclusion should apply to all employment contracts. In support of her position, Scott distinguishes *Dickstein*, which involved a stock exchange registration agreement, not an employment contract. Similarly, Scott argues that the *Gilmer* Court specifically declined to address the question of whether the § 1 exclusion applies to all employment contracts, as the situation before the *Gilmer* Court also concerned a stock exchange registration agreement. *See Gilmer*, —— U.S. at —— n. 2, 111 S.Ct. at 1651 n. 2.

The *Dickstein* court, however, expressly found that the registration agreement was "an integral and mutually binding part of appellant's employment arrangement." *Dickstein*, 443 F.2d at 785. Having so determined, the court focused its decision on the issue of whether a registered representative of the New York Stock Exchange would be considered an employee "engaged in foreign or interstate commerce." *Id.* In support of its holding that such employees must be "involved in, or closely related to, the actual movement of goods in interstate commerce," *id.*, the court cited to decisions of the Second and Third Circuits, which held that to be eligible for the § 1 exclusion, the employee must be engaged in the transportation industry. *Id.* (citing *Tenney Eng'g, Inc. v. United Elec. Radio & Mach. Workers*, 207 F.2d 450, 452–453 (3d Cir.1953); *Signal–Stat Corp. v. Local 475*, 235 F.2d 298 (2d Cir.1956), *cert. denied*, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428 (1957)).

To understand the logic behind the *Dickstein* holding, it is helpful to look at the legislative history of the FAA. According to a report of the American Bar Association, which sponsored the bill, there was an objection made on behalf of the Seamen's Union, that seamen's wages come under admiralty jurisdiction and should not be subject to agreements to arbitrate. *See Tenney*, 207 F.2d at 452 (quoting 48 Am.Bar Assn.Rep. 287 (1923)). When faced with this issue, the drafters of the bill added the exclusionary language for seamen, and for railroad workers, who also had their own special procedures for the resolution of disputes. *Id.* In consideration of the foregoing, it seems logical that the drafters "rounded out the exclusionary clause by excluding all other similar classes of workers." *Id.* at 453. *See also Hull v. NCR Corp.*, 826 F.Supp. 303, 306 (E.D.Mo.1993); *DiCrisci v. Lyndon Guar. Bank of New York*, 807 F.Supp. 947, 953 (W.D.N.Y.1992). *But see Willis v. Dean Witter Reynolds, Inc.*, 948 F.2d 305, 311 (6th Cir.1991) (relying on Justice Stevens' dissent in *Gilmer* and other legislative history of the FAA, to support the contention that the § 1 exclusion applies to all employment contracts).

In further support of her argument that the § 1 exclusion should apply to all employment contracts, Scott reasons that the exclusion of only the transportation industry is an arbitrary distinction without meaning or purpose in the context of modern labor relations. She argues that it is absurd to limit the § 1 exclusion on the grounds that in 1925, when the FAA was passed, seamen and other transportation workers were subject to certain regulations apart from those set forth in their arbitration agreements.

However persuasive Scott may be in her logic, this court is the wrong forum for her argument. If the reasons behind the § 1 exclusion are outdated, then it is for Congress alone to address this inadequacy. Furthermore, current public policy suggests that the FAA should be read to further, rather than discourage, the use of arbitration. *See Moses H. Cone Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1982) ("The Arbitration Act establishes that, as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration...."). The court, therefore, rejects Scott's argument that the § 1 exclusion ap-

plies to all employment contracts. By so holding, this court adheres to the view adopted by the First Circuit that the § 1 exclusion is limited to only those employees "involved in or closely related to the actual movement of goods in interstate commerce." *Dickstein,* 443 F.2d at 785.

Scott argues, in the alternative, that the court should consider her an employee engaged in interstate commerce because she sold insurance policies in Massachusetts which originated in New York. Scott concedes that she did not actually transport the policies. Nevertheless, she attempts to distinguish *Corion,* 1991 WL 280288, *4 1991 U.S.Dist. LEXIS 18395, *12, by arguing that she was instrumental in the sale, and thus, the actual movement of these policies in interstate commerce, and not just the manufacture (or drafting) of the product. This court determines, however, that Scott was not sufficiently involved in the actual movement of goods in interstate commerce. Accordingly, Scott's argument that her employment contract should be eligible for the § 1 exclusion is rejected.

**B.** *MCAD's failure to prosecute her charge*

Scott further argues that her situation is distinguishable from that in *Gilmer* because there, the Court relied on the fact that a discrimination claimant, who was subject to an arbitration agreement, would still be free to file a charge with the Equal Employment Opportunity Commission ("EEOC"), even though the claimant could not institute a private judicial action. *Gilmer,* —— U.S. at ——, 111 S.Ct. at 1653. Scott argues that she did not have this option because, in her case, the MCAD failed to timely prosecute her charge, thereby forcing her to file suit.

This court finds, however, that the holding in *Gilmer* is not based on the fact that the plaintiff could file a charge with the EEOC. Rather, the *Gilmer* Court addressed this issue in response to Gilmer's argument that forcing parties to submit to arbitration would undermine the role of the EEOC in enforcing the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621–634. In addition to reasoning that plaintiffs would still be free to file a charge with the EEOC,

the Court stated that "nothing in the ADEA indicates that Congress intended that the EEOC be involved in all employment disputes. Such disputes can be settled, for example, without any EEOC involvement." *Id.*

Furthermore, although this court notes that Scott's experience with the MCAD was certainly wanting, the MCAD's inaction regarding her charge is irrelevant to a determination that the FAA mandates enforcement of Scott's agreement to arbitrate.

**C.** *Arbitrators' ability to handle discrimination claims*

Scott further argues that she cannot trust that the arbitrators have the necessary expertise or will apply the correct standards and burdens of proof in handling her discrimination claims. She also fears that the full range of damages will not be available to her, because in states like New York (where defendants reside), arbitrators cannot award punitive damages. The *Gilmer* Court, however, expressly rejected such arguments, finding that arbitrators can ably resolve issues of discrimination. *See Gilmer,* —— U.S. at —— – ——, 111 S.Ct. at 1654–55.

**D.** *Retroactive application of Gilmer*

Scott next argues that at the time she entered into the Agent Contract, employment discrimination claims were not subject to arbitration, and thus it was not within the contemplation of the parties to contract away anti-discrimination provisions.

Scott entered into the arbitration agreement in 1986 and renewed it in 1988. At that time, the controlling law was the Supreme Court's decision in *Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974), which held that a union employee was not precluded from bringing an action under Title VII after having been unsuccessful in an arbitration compelled by a collective bargaining agreement. In 1989, *after* Scott entered the Agent Contract with defendants, the First Circuit interpreted *Alexander* to mean that employees cannot prospectively waive their right to court adjudication of Title VII claims by signing an arbitra-

tion agreement. *Utley v. Goldman Sachs & Co.*, 883 F.2d 184 (1st Cir.1989), *cert. denied*, 493 U.S. 1045, 110 S.Ct. 842, 107 L.Ed.2d 836 (1990).

The Supreme Court in *Gilmer* limited the scope of the *Alexander* decision, and thereby effectively overruled *Utley*, by finding that employment discrimination claims *are* appropriate for arbitration. The *Gilmer* Court did not overrule *Alexander*, but rather distinguished it for the following reasons: First, in *Alexander*, the employee had brought a contractual claim based on a collective bargaining agreement to a grievance committee. This claim was different from his Title VII statutory claim, although the two claims arose from the same conduct. The employees had not agreed to arbitrate their statutory claims. *Gilmer*, —— U.S. at ——, 111 S.Ct. at 1657. Second, the Court was concerned that in the collective bargaining process, the interests of the individual might be subordinated to the collective interests of the employees in the bargaining unit. *Id.* Third, *Alexander* was not decided under the FAA, which "reflects a liberal federal policy favoring arbitration agreements.'" *Id.* (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 625, 105 S.Ct. 3346, 3353, 87 L.Ed.2d 444 (1985)).

Courts since *Gilmer*, when faced with a statutory employment discrimination claim and an arbitration agreement, have enforced the agreement to arbitrate. *See, e.g., Mago v. Shearson Lehman Hutton, Inc.*, 956 F.2d 932 (9th Cir.1992); *Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698 (11th Cir.1992); *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229 (5th Cir.1991); *Willis*, 948 F.2d at 312; *Foley v. Presbyterian Ministers' Fund*, 1992 WL 63269 1992 U.S.Dist. LEXIS 3572 (E.D.Pa. Mar. 19, 1992); *Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 1992 WL 245506 1992 U.S.Dist. LEXIS 13749 (S.D.N.Y. Sept. 10, 1992); *Sacks v. Richardson Greenshield Sec., Inc.*, 781 F.Supp. 1475 (E.D.Cal.1991).

Furthermore, the court in *Foley*, 1992 WL 63269 at *2 1992 U.S.Dist. LEXIS 3572, at *5–*6, addressed the issue of whether to apply *Gilmer* retroactively in a situation factually similar to the present case. In *Foley*, the plaintiff entered into an arbitration agreement at a time when *Alexander* was the controlling law in the Third Circuit. Two years later, the Third Circuit interpreted *Alexander* to mean that employment discrimination claims could not be arbitrated. *Id.* 1992 WL 63269 at *2, 1992 U.S.Dist. LEXIS 3572 at *5. Three years later, the Supreme Court decided *Gilmer*. In opposition to the motion to compel arbitration in *Foley*, the plaintiff argued that the court should not apply *Gilmer* retroactively. *Id.* The court held, however:

> Retroactive application of the rule will promote arbitration, in consonance with strong federal policy. And there is no inequity in directing [plaintiff], in 1992, to conform to an undertaking to arbitrate that he elected to enter into in 1987. The fact that the Third Circuit ... in 1989, gave arbitration undertakings of this kind a narrower reading than the Supreme Court, two years later in *Gilmer*, was to assent to, gave [plaintiff] no vested right in the permanence of the narrower reading.

*Id.* 1992 WL 63269 at *2, 1992 U.S.Dist. LEXIS 3572 at *6.

Here, Scott entered into the arbitration agreement at a time when *Alexander* was controlling and thus she had a vested right only in the law according to *Alexander*. Scott's situation here is factually distinguishable from *Alexander* and thus an argument that *Alexander* precludes arbitration of her claims is without merit. Furthermore, the fact that after entering into the agreement, the First Circuit narrowly interpreted *Alexander* to preclude arbitration of all employment discrimination claims is irrelevant to what was in the contemplation of the parties at the time of contracting.

Accordingly, this court determines that Scott's claims are subject to mandatory arbitration.

### III

#### Conclusion

Having determined that Scott's claims are subject to mandatory arbitration, this court GRANTS defendants' motion to dismiss

without prejudice. Accordingly, defendants' motion for stay of discovery is MOOT.