The defendants, Robert Frank McAlpine and Robert Frank McAlpine Architecture, Inc., appeal from the trial court's order denying their motion to compel arbitration of the various contract and tort claims filed against them by the plaintiffs, William E. Heilpern and his wife Lauda Heilpern. We reverse and remand.
The facts pertinent to this appeal are undisputed. The Heilperns, who are Montgomery residents, hired Robert Frank McAlpine, a Montgomery architect, to provide architectural services in connection with the remodeling of their house. The Heilperns and McAlpine executed a contract entitled "Standard Form of Agreement Between Owner and Architect"; that contract contained the following predispute arbitration clause:
 "Claims, disputes or other matters in question between the parties to this Agreement arising out of or relating to this Agreement or breach thereof shall be subject to and decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect unless the parties mutually agree otherwise."
In the course of providing services to the Heilperns, McAlpine specified that certain items were to be used in the remodeling, such as appliances, plumbing fixtures, lighting fixtures, etc., that could be acquired only from out-of-state manufacturers. The contractor hired by the Heilperns to perform the remodeling work was, thus, required to purchase those items from out of state and to have them shipped into Alabama (e.g., from New York, Pennsylvania, Wisconsin, and Massachusetts). Ultimately, the Heilperns, dissatisfied with the work done on their house, sued McAlpine individually and his architectural firm vicariously, as well as the contractor and the contractor's firm, seeking damages based on allegations of breach of contract, fraud, conversion, and conspiracy. This appeal concerns only the trial court's denial of the McAlpine defendants' motion to compel arbitration. (Hereinafter, both McAlpine and his firm are referred to as "McAlpine.")
Under the Federal Arbitration Act, 9 U.S.C. § 1-16 ("FAA"), "[a] written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Heilperns do not dispute that their contract with McAlpine is one "involving commerce" within the meaning of § 2 of the FAA. Neither do the Heilperns dispute that the arbitration clause contained in the contract is broad enough in scope to encompass all of their claims. Rather, the Heilperns contend, and the trial court held, that § 1 of the FAA exempts their contract from the operation of federal arbitration law; therefore, they argue, federal law does not preempt Alabama statutory law and public policy prohibiting enforcement of predispute arbitration agreements.[1]
Section 1 of the FAA, in pertinent part, states that "nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." McAlpine contends that § 1 should be construed narrowly so as to exempt only employment contracts of workers directly engaged in the movement of goods in interstate commerce, i.e., in the transportation *Page 740 
and distribution of goods in interstate commerce. McAlpine argues that, although his contract involved interstate commerce, for purposes of applying the FAA, he was not directly engaged in the movement of goods in interstate commerce during the time he worked for the Heilperns. The Heilperns contend that § 1 should be construed broadly so as to exempt from the provisions of § 2 all contracts of employment that facilitate or affect interstate commerce (even tangentially); therefore, the Heilperns maintain, the arbitration clause is not valid and enforceable under the FAA. McAlpine contends, in the alternative, that his contract with the Heilperns is not an employment contract within the meaning of § 1, but, instead, is one for an independent contractor's "services," and that a contract for such services is not covered by the exemption set out in § 1. The Heilperns argue that the contract is an employment contract within the meaning of § 1 and that, even if McAlpine is correct in his interpretation of the scope of the exemption, the contract would fall within the exemption because, they say, McAlpine was directly engaged in the movement of goods in interstate commerce.
Initially, we note that the record does not support the Heilperns' argument that McAlpine was engaged in the movement of goods in interstate commerce during the time he worked for them. In an affidavit filed in support of his motion to compel arbitration, McAlpine stated:
 "The design work that we performed for Mr. and Mrs. Heilpern affected interstate commerce because, among other things, we were hired to design and specify particular items for the house such as appliances, plumbing fixtures, lighting fixtures and the like. A number of these items can only be acquired from manufacturers outside the State of Alabama and by specifying them, we, in effect, required the contractor to purchase items which come from other states and which were brought to Alabama to be installed in the Heilperns' home."
(Emphasis added.) This affidavit, which was not contradicted in the record, indicates that McAlpine's designs specified the use of certain items that had to be purchased from out of state, and that the Heilperns' contractor was responsible for purchasing and having those items shipped into Alabama. McAlpine did not transport goods in an interstate market while he was working for the Heilperns. Therefore, we proceed to what we believe to be the dispositive issue — whether the § 1 exemption should be broadly construed or should be narrowly construed.[2]
This Court is not the first to consider the scope of the exclusion set out in § 1 of the FAA. In fact, it appears that the courts of appeals for 10 of the federal circuits have addressed this particular issue and that each of those courts has held that the exclusionary language in § 1 should be narrowly construed. In Asplundh Tree Expert Co. v. Bates,71 F.3d 592, at 600-01 (6th Cir. 1995), the United States Court of Appeals for the Sixth Circuit surveyed the law among the federal circuits and held that § 1 of the FAA "should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are." Because the opinion in Asplundh contains an extensive history of the construction that has been placed on § 1 by the courts of appeals for the federal circuits, we quote from it extensively, beginning at page 596:
 "In [Willis v. Dean Witter Reynolds, Inc., 948 F.2d 305, 311 (6th Cir. 1991)], another panel of this court said:
 " 'A review of the legislative history of the FAA confirms that the FAA was never meant to incorporate employment contracts with the requisite effects on interstate commerce within its scope. . . . Thus, although Congress passed the FAA to ensure that courts honor the contractual agreement of parties who choose to resolve their disputes by arbitration, it limited the scope of the *Page 741 
Act by creating a category of contracts not subject to the Act's strictures. Among this category of excluded contracts are "contracts for employment." 9 U.S.C. § 1.'
 "Relying on this pronouncement, Asplundh argues that the exclusionary clause contained in § 1 of the Arbitration Act covers all contracts of employment, and that accordingly, the arbitration clause in the second employment agreement is unenforceable. Although the district judge did not address this issue in her decision of March 30, 1994, she agreed with Asplundh in her order of June 8, 1994, when she concluded that Willis compelled a finding that the arbitration clause is unenforceable under § 1 of the Act.
 "Willis involved a claim of sex discrimination by a registered securities representative against her brokerage firm. The registration form she was required to file with the various national securities exchanges contained an arbitration clause which covered any dispute, claim or controversy between herself, her firm, or a customer. As noted above, the Willis court devoted a section of its opinion to the scope of the exclusionary clause contained in § 1 of the Act, and further concluded that it should be broadly construed to extend to all contracts for employment within the scope of the commerce clause of the United States Constitution. Willis, 948 F.2d at 310-312. This [conclusion] was dicta, since the decision in Willis ultimately rested on a determination that the plaintiff's registration form was not an employment contract and thus not covered by the exclusionary language of § 1 of the Act. Id. at 312.
 "We are not required to follow the dicta of Willis which opines that the exclusionary clause of § 1 of the Act applies to all contracts of employment within the scope of the commerce clause. United States v. Tucker, 28 F.3d 1420, 1425
(6th Cir. 1994), cert. denied, 514 U.S. 1049, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995); United States v. Burroughs, 5 F.3d 192, 194 (6th Cir. 1993) ('one panel of this court is not bound by dicta in a previously published panel opinion'); Begley v. Consolidation Coal Co., 826 F.2d 1512, 1517 n. 1 (6th Cir. 1987) ('each of these prior cases must be considered merely dicta, not binding circuit precedent').
 "Since that issue is essential to the decision of the case before us, we will examine it de novo.
We begin by observing that the scope of the exclusionary clause of the Arbitration Act was discussed but not decided in Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991). Gilmer involved a claim of age discrimination by a registered securities salesman against his employer. In order to perform the duties of his employment, Gilmer was required to register with the New York Stock Exchange (N.Y.S.E.). His registration application contained an agreement to arbitrate when required by NYSE rules. NYSE rules required arbitration of any dispute arising out of the termination of a registered representative's employment. Gilmer argued that compulsory arbitration of ADEA claims would be inconsistent with the statutory framework and purposes of the ADEA. The Court rejected his arguments and held that an ADEA claim can be subjected to compulsory arbitration. Id., 500 U.S. at 35, 111 S.Ct. at 1656-1657. In a dissenting opinion joined in by Justice Marshall, Justice Stevens concluded that the exclusionary clause of the Arbitration Act exempted employment contracts from the coverage of the Act. Id., 500 U.S. at 40, 111 S.Ct. at 1659-1660. The majority noted the arguments of amici curiae that Section 1 of the Arbitration Act excluded all contracts of employment from the Act's coverage, but further observed that Gilmer did not raise this issue in the lower courts or in his petition for certiorari. Id., 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2. The majority also concluded that it would be inappropriate to address the scope of the exclusionary clause because the arbitration agreement was not contained in Gilmer's employment contract, and stated, 'Consequently, we leave for another day the issues raised by amici curiae.' Id.
 "The Arbitration Act was originally enacted in 1925 and then reenacted and codified *Page 742 
in 1947. Its purpose was 'to reverse the long-standing judicial hostility to arbitration agreements that had existed at English common law and had been adopted by American courts, and to place arbitration agreements upon the same footing as other contracts.' Gilmer, 500 U.S. at 24, 111 S.Ct. at 1651. As Senior Judge Peck noted in Bacashihua v. [United States] Postal Service, 859 F.2d 402, 404 (6th Cir. 1988):
 " 'The proper interpretation of the exclusionary provision in 9 U.S.C. § 1 has been subject to much debate. The two areas of dispute are whether collective bargaining agreements are "contracts of employment" within § 1's meaning, and whether "workers engaged in . . . interstate commerce" requires that the workers personally be engaged in interstate commerce.'
 "Judge Peck went on to observe that this court had never addressed the interpretation, nor scope, of § 1's exclusionary clause, and he apparently found it unnecessary to do so in Bacashihua, noting that '[i]f any class of workers is engaged in interstate commerce, it is postal workers.' Id. at 405. Judge Peck, however, did refer to a seminal Third Circuit decision which held that the exclusionary language of § 1 applies only to workers personally engaged in interstate commerce. See Tenney Engineering, Inc. v. United Electrical Radio Machine Workers of America, Local 437, 207 F.2d 450 (3d Cir. 1953). Tenney and other cases of similar import were not cited by the Willis court.
 "In Tenney, 207 F.2d at 453, the Third Circuit noted that in 1925, when the Arbitration Act was first drafted, the concept of Congressional power over activities which affected interstate commerce had not developed to the extent to which it has since. The court in Tenney, 207 F.2d at 452, framed its task as follows:
 " 'Our problem, therefore, is to determine the meaning which Congress in 1925 intended to give to the phrase "workers engaged in foreign or interstate commerce". Was it intended to include only those employees actually engaged in the channels of interstate or foreign commerce or did it comprehend all those engaged in activities affecting such commerce, such as the production of goods destined for sale in it?'
 "The court, Id. at 452-453, then discussed the legislative history of the exclusionary clause:
 " 'The only reference to the clause in question appears in a report of the Bar Association committee in which it was stated:
 " ' "Objections to the bill were urged by Mr. Andrew Furuseth as representing the Seamen's Union, Mr. Furuseth taking the position that seamen's wages came within admiralty jurisdiction and should not be subject to an agreement to arbitrate. In order to eliminate this opposition, the committee consented to an amendment to Section 1 as follows: 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees or any other class of workers engaged in foreign or interstate commerce.' " '
 " 'It thus appears that the draftsmen of the Act were presented with the problem of exempting seamen's contracts. Seamen constitute a class of workers as to whom Congress had long provided machinery for arbitration. In exempting them the draftsmen excluded also railroad employees, another class of workers as to whom special procedure for the adjustment of disputes had previously been provided. Both these classes of workers were engaged directly in interstate or foreign commerce. To these the draftsmen of the Act added "any other class of workers engaged in foreign or interstate commerce." We think that the intent of the latter language was, under the rule of ejusdem generis, to include only those other classes of workers who are likewise engaged directly in commerce, that is, only those other classes of workers who are actually engaged in the movement of interstate or foreign commerce or in work so closely related thereto as to be in practical *Page 743 
effect part of it. The draftsmen had in mind the two groups of transportation workers as to which special arbitration legislation already existed and they rounded out the exclusionary clause by excluding all other similar classes of workers.'
"We find this analysis persuasive.[3]
 "Three years later, the Second Circuit followed Tenney in Signal-Stat Corporation v. Local 475, United Electrical Radio Machine Workers of America, 235 F.2d 298, 302-303 (2d Cir. 1956), cert. denied, 354 U.S. 911, 77 S.Ct. 1293, 1 L.Ed.2d 1428
(1957):
 " 'We incline to agree with the decision and reasoning of the Third Circuit in the Tenney case. This conclusion is consonant with our decisions. Although this court has never passed on the precise issue here involved, we did, in Shirley-Herman Co. v. International Hod Carriers, Bldg. Common Laborers Union, 2 Cir., 182 F.2d 806, 809, impliedly hold that a collective bargaining agreement constituted a "contract of employment"; and in Bernhardt v. Polygraphic Co. of America, 2 Cir., 218 F.2d 948, 951-952 [(1955)], reversed on other grounds, 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 [(1956)], we gave a restrictive interpretation to the term, "workers" as used in the exclusionary clause in Section 1.
" '. . . .
 " '. . . [W]e think the courts should interpret the United States Arbitration Act so as to further, rather than impede, arbitration in this area. We think the interpretation of the Third Circuit in Tenney accords both with the modern trend and with what we deem to be the intention of Congress.'
 "In Erving v. Virginia Squires Basketball Club, 468 F.2d 1064, 1069 (2d Cir. 1972), the Second Circuit reaffirmed its decision in Signal-Stat, noting that '[i]n light of the strong national policy in favor of arbitration as a means of settling private disputes we see no reason to give an expansive interpretation to the exclusionary language of Section 1 by reexamining our decision in Signal-Stat, supra.'
 "In 1965, the Seventh Circuit followed suit in Pietro Scalzitti Co. v. International Union of Operating Engineers, Local No. 150, 351 F.2d 576, 580 (7th Cir. 1965) ('We agree with the Second Circuit that this interpretation "accords both with the modern trend and with what we deem to be the intention of Congress." '). The Seventh Circuit recently reaffirmed its position in Miller Brewing Co. v. Brewery Workers Local Union No. 9, 739 F.2d 1159, 1162 (7th Cir. 1984), cert. denied, 469 U.S. 1160, 105 S.Ct. 912, 83 L.Ed.2d 926 (1985), holding that § 1 was inapplicable in that case, and noting that § 1 'has been held to be limited to workers employed in the transportation industries.' *Page 744 
 "The First Circuit reached the same conclusion in Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir. 1971):
 " 'Equally unavailing is appellant's argument that he was a worker "engaged in foreign or interstate commerce" within the exceptions to the Arbitration Act set out in section 1. 9 U.S.C. § 1. Courts have generally limited this exception to employees, unlike appellant, involved in, or closely related to, the actual movement of goods in interstate commerce. [Citing Tenney Engineering, Inc. and Signal-Stat].'
 "Dickstein was cited with approval by this court in Stokes v. Merrill Lynch, Pierce, Fenner Smith, 523 F.2d 433, 436 (6th Cir. 1975):
 " 'Appellants have stipulated that their claims arise directly from their employment with Merrill Lynch in interstate commerce. They do not seriously contend that as "account executives", they fall within the exception from coverage in § 1 of the Arbitration Act for "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce." Cf. Dickstein v. duPont, 443 F.2d 783, 785 (1st Cir. 1971).'
 "With one exception, every circuit court which has addressed this question since Tenney has held that the exclusionary clause of § 1 of the Act should be narrowly construed. The exception is the Fourth Circuit's decision in United Electrical, Radio Machine Workers v. Miller Metal Products, Inc., 215 F.2d 221, 224 (4th Cir. 1954). The Fourth Circuit in Miller Metal Products, 215 F.2d at 224, disagreed with the position taken by the Third Circuit, stating:
 " 'Nor are we impressed by the argument that the excepting clause of the statute should be construed as not applying to employees engaged in the production of goods for interstate commerce as distinguished from workers engaged in transportation in interstate commerce, as held by the majority in Tenney Engineering, Inc. v. United Electrical Radio Mach. Workers, 3 Cir., 207 F.2d 450.'
 "However, the court, Id., went on to expressly limit its holding to the issue of the applicability of the Arbitration Act to collective bargaining agreements:
 " '[W]e do not decide that workers and employers may not agree to arbitrate their differences. Nor do we decide that such agreements to arbitrate may not be specifically enforced. What we decide, and all we decide, is that the arbitration clause in the collective bargaining agreement here does not cover the matter of damages arising out of violation of the no-strike clause and that the provisions of the United States Arbitration Act may not be relied on to stay proceedings in a suit brought on a collective bargaining agreement entered into by workers engaged in interstate commerce as those here were engaged.'
 "It is questionable whether Miller Metal Products
is still good law even in the Fourth Circuit. One district court in the Fourth Circuit declined to follow it in Kropfelder v. Snap-On Tools Corp., 859 F. Supp. 952, 958 (D.Md. 1994), stating:
 " 'In light of the time which has passed since the Miller Metal decision, the strong federal policy in favor of arbitration, and the great weight of circuit court authority, this Court is of the view that the Fourth Circuit would not, as of this date, apply the words used in Miller Metal so as to exclude § 1's application in all non-collective bargaining contexts, and would instead apply the views expressed by a majority of the courts that as to non-collective bargaining contracts the FAA excludes only those workers involved in the interstate transportation of goods.'
 "Another in-depth analysis of § 1 of the Act can be found in DiCrisci v. Lyndon Guaranty Bank, 807 F. Supp. 947, 953 (W.D.N.Y. 1992):
 " 'An analysis of the Act also supports the conclusion that § 1 refers to actual interstate commerce. Although at first glance it might seem likely that Congress would have intended "commerce" *Page 745 
to have the same meaning throughout the Act, the reference to "workers engaged in foreign or interstate commerce" in § 1 would be surplusage if it were simply coextensive with Congress's powers under the commerce clause. Under [Southland Corp. v. Keating, 465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)], § 2 gives the Act as a whole the same reach as Congress's commerce clause power. Therefore, if Congress had wanted to [exclude] all employment contracts from the Act, it could simply have said "employment contracts" and left it at that. Any workers beyond the reach of the commerce clause would not be covered by the Act in the first place. The language of § 1 also reinforces this view; the reference to "seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce," suggests that Congress intended to refer to workers engaged in commerce in the same way that seamen and railroad workers are. (emphasis in the original)'
 "District court decisions which follow Tenney, Signal-Stat, Pietro Scalzitti, Dickstein
and Erving and adopt a narrow construction of the exclusionary clause of § 1 of the FAA include: Albert v. National Cash Register Co., 874 F. Supp. 1324, 1326-1327 (S.D.Fla. 1994) (expressly declining to [follow] Willis, noting 'It is quite impossible to apply a broad meaning to the term "commerce" in Section 1 and not rob the rest of the exclusion clause of all significance.'); Cherry v. Wertheim Schroder Co., 868 F. Supp. 830, 834-835
(D.S.C. 1994); Crawford v. West Jersey Health Systems, 847 F. Supp. 1232, 1240-1242 (D.N.J. 1994) (expressly declining to follow Willis, finding its reasoning 'less compelling' than Judge Larrimer's statutory analysis in DiCrisci); Scott v. Farm Family Life Ins. Co., 827 F. Supp. 76, 77-79
(D.Mass. 1993); Hull v. NCR Corp., 826 F. Supp. 303, 307 (E.D.Mo. 1993) (declining to follow Miller Metal Products and noting that its holding pertained only to an arbitration clause in a collective bargaining agreement); In Matter of Arbitration Under Agreements Between Management Recruiters Int'l, Inc. and Nebel, 765 F. Supp. 419, 421-422 (N.D. Ohio 1991). But see Arce v. Cotton Club of Greenville, Inc., 883 F. Supp. 117, 118-123 (N.D.Miss. 1995) ('[T]his court does not follow the line of cases interpreting the exclusion clause of 9 U.S.C. § 1
to apply only to those class[es] of employees actually engaged in the movement of goods in foreign or interstate commerce.').
 "We conclude that the exclusionary clause of § 1 of the Arbitration Act should be narrowly construed to apply to employment contracts of seamen, railroad workers, and any other class of workers actually engaged in the movement of goods in interstate commerce in the same way that seamen and railroad workers are. We believe this interpretation comports with the actual language of the statute and the apparent intent of the Congress which enacted it. The meaning of the phrase 'workers engaged in foreign or interstate commerce' is illustrated by the context in which it is used, particularly the two specific examples given, seamen and railroad employees, those being two classes of employees engaged in the movement of goods in commerce.
 "Furthermore, there is an obvious difference between the wording of § 2 of the Act, which defines what the Act covers, and the exclusionary clause of § 1. Section 2 extends the coverage of the Act to 'any maritime transaction or a contract evidencing a transaction involving commerce.' The exclusionary clause does not employ the same broad language of § 2. If Congress had intended the exclusion to be as broad as the coverage, it would have used the same language in the exclusion clause.
 "The legislative history of the Act cited in Tenney Engineering indicates that the exclusionary clause was added to overcome the objection of the seamen's union. Justice Stevens in his dissent in Gilmer cites additional legislative history, 500 U.S. at 39, 111 S.Ct. at 1659. It does not, however, persuade us that Congress intended the exclusionary clause to apply to all contracts of employment. The comment of the chairman of the American Bar Association committee responsible for drafting the *Page 746 
bill to the effect that the bill 'is not intended [to] be an act referring to labor disputes, at all' would tend to support the contention that the Act was not intended to apply to collective bargaining agreements, but sheds no further light on the issue of individual employment contracts. The comments of Senator Walsh quoted by Justice Stevens in Gilmer reflect on objections to the enforcement of arbitration agreements in general on the ground that they are often contracts of adhesion. Congress rejected Senator Walsh's arguments when it passed the Act.*
 "Finally, we believe a narrow construction of the exclusionary clause is consistent with the underlying purpose of the Act, which is to favor arbitration. The history of the treatment of the Arbitration Act in the Supreme Court of the United States reflects a clear disposition to liberalize and expand its application. See, Southland Corp. v. Keating, 465 U.S. 1, 10, 104 S.Ct. 852, 858, 79 L.Ed.2d 1 (1984) ('In enacting § 2 of the federal Act, Congress declared a national policy favoring arbitration and withdrew the power of the states to require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration.'); [Moses H. Cone Memorial Hospital v. Mercury Construction Corp., 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983)] ('Section 2 is a congressional declaration of a liberal federal policy favoring arbitration agreements[.]'); Prima Paint Corp. v. Flood Conklin Mfg. Co., 388 U.S. 395, 404, 87 S.Ct. 1801, 1806, 18 L.Ed.2d 1270 (1967) ('[W]e not only honor the plain meaning of the statute but also the unmistakably clear congressional purpose that the arbitration procedure, when selected by the parties to a contract, be speedy and not subject to delay and obstruction in the courts.'). Viewed in the light of this liberal and expansive interpretation of the coverage of the Arbitration Act, a narrow construction of the exclusionary clause would seem more logical and consistent with the national policy the Supreme Court has attributed to the Act.
71 F.3d at 596-602.
Since the Sixth Circuit decided Asplundh, the Court of Appeals for the Fifth Circuit, in Rojas v. T.K. Communications,Inc., 87 F.3d 745 (5th Cir. 1996);[4] the Court of Appeals for the District of Columbia, in Cole v. Burns International SecurityServices, 105 F.3d 1465 (D.C. Cir. 1997); the Court of Appeals for the Eighth Circuit, in Patterson v. Tenet Healthcare, Inc.,113 F.3d 832 (8th Cir. 1997); and the Court of Appeals for the Eleventh Circuit, in Paladino v. Avnet Computer Technologies,Inc., 134 F.3d 1054 (11th Cir. 1998),[5] have adopted the rationale of the *Page 747 
First, Second, Third, Sixth, and Seventh Circuits and have narrowly construed § 1 so as to foster a broader application of the FAA. The court in Cole made the following pertinent observations:
 "The narrow interpretation of the exclusionary clause in section 1 is also supported by the Supreme Court's decision in Allied-Bruce Terminix Cos., 513 U.S. at 265, 115 S.Ct. at 834. Allied-Bruce Terminix involved the interpretation of section 2 of the FAA, specifically, whether the language — 'a contract evidencing a transaction involving commerce' — extended the Act's reach to the full limits of Congress's commerce clause powers. In concluding that section 2 did reach to the limits of the commerce clause, the Court contrasted the phrase 'involving commerce,' found in section 2, with the term 'in commerce,' which is found in the exclusionary clause of section 1:
 " 'The initial interpretive question focuses upon the words "involving commerce." These words are broader than the often-found words of art "in commerce." They therefore cover more than " 'only persons or activities within the flow of interstate commerce.' " United States v. American Building Maintenance Industries, 422 U.S. 271, 276, 95 S.Ct. 2150, 2154, 45 L.Ed.2d 177 (1975), quoting Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 398, 42 L.Ed.2d 378
(1974) (defining "in commerce" as related to the "flow" and defining the "flow" to include "the generation of goods and services for interstate markets and their transport and distribution to the consumer"); see also FTC v. Bunte Brothers, Inc., 312 U.S. 349, 351, 61 S.Ct. 580, 582, 85 L.Ed. 881 (1941).'
 "Allied-Bruce Terminix Cos., 513 U.S. at 273, 115 S.Ct. at 839. This analysis strongly suggests that section 1's exclusion of 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' covers only those workers actually involved in the 'flow' of commerce, i.e., those workers responsible for the transportation and distribution of goods.
 "Finally, although the decision in Gilmer did not reach the issue of section 1's scope, see Gilmer, 500 U.S. at 25 n. 2, 111 S.Ct. at 1651 n. 2, and did not analyze the arbitration agreement at issue as an employment contract, see id., the majority opinion indicates that the Court would be inclined to read section 1 narrowly, as we do today. Gilmer enforced an agreement to arbitrate *Page 748 
all employment-related claims that was entered into as a condition of employment. As Justice Stevens's dissent suggests, see Gilmer, 500 U.S. at 40, 111 S.Ct. at 1659-60, if the FAA actually excluded all employment contracts from the enforcement provisions of the FAA, it would be anomalous to compel arbitration of Gilmer's employment claims simply because the arbitration agreement was not formally part of a 'contract for employment.' We believe that the result reached in Gilmer implicitly suggests that the FAA does not exclude all contracts of employment.
 "We recognize that, as Justice Stevens argued in his Gilmer dissent, and as appellant argues here, the legislative history of section 1 of the FAA may be read to indicate that Congress intended to exclude all contracts of employment from the coverage of the FAA. Id. at 38-39, 111 S.Ct. at 1658-59. See Jean R. Sternlight, Panacea or Corporate Tool? Debunking the Supreme Court's Preference for Binding Arbitration, 74 Wn. U.L.Q. 637 (1996) (analyzing history of FAA and its interpretation). Nevertheless, we believe that there are compelling reasons to hold that section 1 of the FAA only excludes from the provisions of the Act the employment contracts of workers engaged in the transportation of goods in commerce. In a case such as this, where the statutory text does not admit of serious ambiguity, and where firmly established case law is absolutely clear on the meaning of the statute, legislative history is, at best, secondary, and, at worst, irrelevant. See, e.g., Davis v. Michigan Dep't of Treasury, 489 U.S. 803, 808-09 n. 3, 109 S.Ct. 1500, 1504 n. 3, 103 L.Ed.2d 891 (1989) ('Legislative history is irrelevant to the interpretation of an unambiguous statute')."
105 F.3d at 1471-72. In addition, the Court of Appeals for the Fourth Circuit, in O'Neil v. Hilton Head Hospital,115 F.3d 272, 274 (4th Cir. 1997), recently joined the other courts of appeals that have addressed the issue, by holding that a respiratory therapist employed by a hospital was not included in the § 1 exemption because, the court said, she "was not engaged in the interstate transportation of goods." In so holding, the court noted that its previous decision in UnitedElectrical, Radio Machine Workers v. Miller Metal Products,Inc., 215 F.2d 221 (4th Cir. 1954), which was discussed and questioned in Asplundh, supra, was no longer controlling with respect to the issue of the construction to be placed on § 1. The court stated that it agreed with the uniform body of precedent from the federal courts of appeals, and it noted:
 "United Electrical, Radio Machine Workers v. Miller Metal Products, Inc., 215 F.2d 221 (4th Cir. 1954), is not to the contrary. To begin with, this case predates the substantial body of Supreme Court precedent supporting utilization of the arbitration process. Even if we were to assume that Miller Metal Products had any remaining vitality, however, it clearly does not apply to individual employment contracts. Id., at 224."
115 F.3d at 274, n. 1.[6]
In addition, we note that the Court of Appeals for the Third Circuit recently reaffirmed its holding in Tenney. See GreatWestern Mortgage Corp. v. Peacock, 110 F.3d 222 (3d Cir. 1997), cert. denied, ___ U.S. ___, 118 S.Ct. 299, 139 L.Ed.2d 230
(1997) (rejecting the argument that Pritzker v. Merrill Lynch,Pierce, Fenner Smith, Inc., 7 F.3d 1110 (3d Cir. 1993), had changed the law in the Third Circuit). See, also, FarmlandDairies, Inc. v. Milk Drivers Dairy Employees Union Local680, Int'l Brotherhood of Teamsters, AFL-CIO, 956 F. Supp. 1190
(D.N.J. 1997) (following Tenney); and Nieves v. IndividualizedShirts, 961 F. Supp. 782 (n. 3) (D.N.J. 1997) (providing additional history and noting the majority trend of narrowly construing § 1). It is also significant, we think, that even though the Ninth and Tenth Circuits have apparently not directly spoken to this issue, some federal district courts within those circuits have followed the majority of the federal courts of appeals that have *Page 749 
spoken to the issue. See Golenia v. Bob Baker Toyota,915 F. Supp. 201 (S.D.Cal. 1996), wherein the district court concluded that there was no binding precedent in the Ninth Circuit and followed the majority of the federal circuits, refusing to be bound by the "one-line dictum" to the contrary in Herring v.Delta Air Lines, Inc., 894 F.2d 1020, 1023 (9th Cir. 1989), cert. denied, 494 U.S. 1016, 110 S.Ct. 1319, 108 L.Ed.2d 495
(1990), which, the court stated, lacked analysis and supporting citation to authority. But see Mittendorf v. Stone Lumber Co.,874 F. Supp. 292 (D.Or. 1994). Also, in Durkin v. CIGNA Property Casualty Corp., 942 F. Supp. 481 (D.Kan. 1996), the federal district court, questioning the holding in Mercury Oil RefiningCo. v. Oil Workers International Union, CIO, 187 F.2d 980
(10th Cir. 1951), concluded that the question of the proper construction to be placed on § 1 had not been resolved in the Tenth Circuit and followed Tenney and Asplundh. See, also,McWilliams v. Logicon, Inc., (No. 95-2500, D.Kan., July 9, 1996) (not published in Federal Supplement) (followingAsplundh). Our research has also revealed that at least two state courts presented with the issue have followed the trend of the federal courts of appeals in construing § 1 narrowly. Addressing the issue for the first time, the Supreme Court of Hawaii, in Brown v. KFC National Management Co., 82 Haw. 226,921 P.2d 146 (1996), reconsideration denied, 82 Haw. 360,922 P.2d 973 (1996), noted the district court's holding inGolenia and followed the majority of the federal circuits. See, also, Freeman v. Minolta Business Systems, Inc., 699 So.2d 1182
(La.App. 1997).
After carefully considering the record and the briefs, we are persuaded by the considerable body of federal court of appeals decisions that has developed with respect to this issue. We are particularly persuaded by the observation that a narrow interpretation of § 1 is supported by the Supreme Court's decision in Allied-Bruce Terminix Companies v. Dobson, supra. The Supreme Court specifically held in Allied-Bruce Terminix
that the words "involving commerce," as used in § 2 of the FAA, were intended by Congress to be broader in scope than the "often found words of art 'in commerce.' " 513 U.S. at 273,115 S.Ct. at 839. The Court stated that the words "in commerce" (the words used in § 1 of the FAA) covered only persons or activities within the flow of interstate commerce and that the word "flow" included the generation of goods and services for interstate markets and their transport and distribution to the consumer. 513 U.S. at 273, 115 S.Ct. at 839. We also agree with the conclusion reached by the courts of appeals for the various circuits that Congress's specific reference to seamen and railroad workers reflects an intent to limit the scope of the exemption to workers directly engaged in the transportation of goods in an interstate market, as opposed to workers involved in the generation of goods and services for interstate markets. Therefore, we hold, as 10 United States Courts of Appeals — those for the First, Second, Third, Fourth, Fifth, Sixth, Seventh, Eighth, and Eleventh Circuits and the District of Columbia — have held: that the § 1 exemption of "contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce" covers only those workers directly engaged in the movement of goods in interstate commerce, i.e., those workers directly engaged in the interstate transportation and distribution of goods. We conclude, as all of the federal courts of appeals that have considered the issue have apparently concluded, that the § 1 exemption was included by Congress as a concession to organized labor, specifically the Seamen's Union, and that, consistent with Congressional intent that the FAA be broad in scope, the exemption was intended to be a narrow one, not applying to employment contracts across the board, but, instead, to the employment contracts of those workers directly engaged in the movement of goods in interstate commerce. See American PostalWorkers Union, AFL-CIO v. United States Postal Service,823 F.2d 466, 470, 473 (11th Cir. 1987), wherein the Court of Appeals for the Eleventh Circuit, although finding it unnecessary to reach this issue in that case, nonetheless noted:
 "The [Federal Arbitration Act] was passed in 1925. Prior to that time, for a variety of reasons (not the least of which *Page 750 
was what today seems an irrational judicial hostility to arbitration in general), executory agreements to arbitrate contractual disputes had been held unenforceable. Congress, viewing arbitration as a useful alternative to protracted litigation, remedied this situation for the federal courts, at least where there was an independent basis for federal jurisdiction over the dispute. The [FAA] provided, in general terms, that agreements to arbitrate contained in contracts 'evidencing a transaction involving commerce' would be enforceable. 9 U.S.C. § 2
(1982). However, judges were not alone in their suspicion of arbitration. Organized labor, which was already aggrieved by actions of the federal judiciary, did not want federal courts to have the power to order it to arbitrate disputes with management. Accordingly, at the behest of the Seamen's Union, Congress included in the [FAA] the following provision: 'but nothing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.' 9 U.S.C. § 1."
823 F.2d at 470-71.
Therefore, because McAlpine, in the performance of his contract with the Heilperns, was not engaged in the transportation and distribution of goods in interstate commerce, the contract does not fall within the § 1 exemption, and the FAA applies. The trial court's order denying McAlpine's motion to compel arbitration is reversed, and the cause is remanded for further proceedings.
REVERSED AND REMANDED.
HOOPER, C.J., and MADDOX and SEE, JJ., concur.
ALMON, J., concurs in the result.
[1] The specific enforcement of a predispute arbitration agreement is barred by both Alabama's statutory law and its public policy, unless federal law preempts them. Lopez v. Home BuyersWarranty Corp., 670 So.2d 35 (Ala. 1995). But see Article IV, § 84, Constitution of Alabama of 1901 (called to the author's attention on March 24, 1998, by Associate Justice Champ Lyons). The FAA preempts contrary state law and, thus, renders enforceable a predispute arbitration agreement contained in a contract that "involves" interstate commerce. Jim BurkeAutomotive, Inc. v. Beavers, 674 So.2d 1260 (Ala. 1995), citingAllied-Bruce Terminix Companies v. Dobson, 513 U.S. 265,115 S.Ct. 834, 130 L.Ed.2d 753 (1995). For an in-depth discussion of the breadth of Congress's regulatory power under the Commerce Clause (in the arbitration context), see Hurst v. TonyMoore Imports, Inc., 699 So.2d 1249 (Ala. 1997).
[2] In light of our specific holding in this case, we pretermit any discussion of McAlpine's alternative argument — that § 1 does not exempt contracts for the performance of independent architectural services.
[3] The Court in Tenney also observed:
 "It must be remembered that the Arbitration Act of 1925 was drawn and passed at a time when the concept of Congressional power over individuals whose activities affected interstate commerce had not developed to the extent to which it was expanded in the succeeding years. The area in which Congress then generally legislated is illustrated by the Federal Employers' Liability Act of 1908 which applied to a railroad employee injured 'while he is employed by such carrier [by railroad] in such [interstate or foreign] commerce.' This language had been construed by the Supreme Court to include only employees engaged in interstate transportation or in work so closely related to it as to be practically a part of it. In incorporating almost exactly the same phraseology into the Arbitration Act of 1925 its draftsmen and the Congress which enacted it must have had in mind this current construction of the language which they used.
 "Moreover when Congress later proceeded to exercise power under the commerce clause in the expanded area, to which we have referred, it continued to use the phrase 'engaged in commerce' in the narrower sense while using other and more precise language to include activities merely affecting commerce. Thus Congress made the Fair Labor Standards Act applicable not only to employees 'engaged in commerce' but also to those engaged 'in the production of goods for commerce.' Congress, as the Supreme Court pointed out in McLeod v. Threlkeld, 1943, 319 U.S. 491, 63 S.Ct. 1248, 87 L.Ed. 1538, has thus used precise language in this field to carry out its intentions. We think it did so in the Arbitration Act of 1925."
207 F.2d at 453.
* "Senator Walsh's questions in the hearing of January 31, 1923, reflect his understanding that the literal language of the Act would cover individual employment contracts, insurance contracts, building contracts and shipping contracts, not just commercial disputes between merchants. Senator Walsh seemed to suggest that, in order to overcome his objections, the proposed Act should be amended to cover only commercial disputes between merchants — the kind of disputes described by the subcommittee's first witness, Mr. Bernheimer — as illustrated by the senator's comment: 'Mr. Piatt, perhaps you could think of some way by which that objection could be obviated. I really believe that in the class of cases that Mr. Bernheimer has in mind, it would be a very useful thing, and I would be disposed to favor it[.]' Hearing on S. 4213 and S. 4214 before a Subcommittee of the Senate Committee on the Judiciary, 67th Cong., 4th Sess., 11 (1923). Of course, no such amendment was made."
[4] We note the Heilperns' reference to Arce v. Cotton Club ofGreenville, Inc., 883 F. Supp. 117 (N.D.Miss. 1995), in which a Mississippi federal district court ruled that § 1 exempted all employment contracts from the operation of the FAA. That decision was announced on April 28, 1995. The Rojas decision was announced on July 11, 1996. The Arce decision is, therefore, not the law in the Fifth Circuit.
[5] Paladino was decided on February 4, 1998, by a three-judge panel composed of Chief Judge Hatchett and Judges Cox and Tjoflat. We note that Chief Judge Hatchett, in a separate opinion (which on its face appears to be the lead opinion in the case), at n. 1, did not reach the question concerning the scope of § 1:
 "It is assumed that the exception contained in section 1 of the FAA for 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce' does not apply to the agreement at issue here. It is best not to decide this issue because it is unclear that the district court fully considered it, and because Paladino failed to adequately develop the record with respect to her actual responsibilities as a Regional Technical Sales Consultant for the Southeastern United States. Although a majority of the circuits that have addressed the section 1 exception have construed it narrowly, see Cole v. Burns Int'l Sec. Servs., 105 F.3d 1465, 1470-72
(D.C. Cir. 1997) (listing cases and adopting narrow construction of section 1's scope), a considerable body of scholarly opinion suggests that those circuits' view of section 1 is incorrect. See generally Joseph R. Grodin, Arbitration of Employment Discrimination Claims: Doctrine and Policy in the Wake of Gilmer, 14 Hofstra Lab. L.J. 1 (1996); Matthew W. Finkin, 'Workers' Contracts' Under the United States Arbitration Act: An Essay in Historical Clarification, 17 Berkeley J. Emp. Lab. L. 282 (1996). The issue of section 1's scope was raised, but not decided, in the Supreme Court's Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), decision."
134 F.3d at 1057.
However, Judge Cox, joined by Judge Tjoflat, specifically addressed the issue, stating:
 "Furthermore, the appearance of the arbitration clause in an employment contract does not exempt the clause from the FAA under that Act's first section. All but one of the other circuits to have addressed the issue have held that the FAA § 1's exemption [sic] of 'contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce,' 9 U.S.C. § 1, includes only employees actually engaged in transportation of goods in commerce. [Citations omitted.] This construction accords with the statute's text and history. [Citation omitted.] Although the district court may not have addressed this issue (we have no opinion in the record to tell us), the issue is presented in this case, and we join these other circuits.
 "According to the allegations of the complaint — the only facts we have at present — Paladino provided technical support to computer system salespeople. There is no evidence that this required her to move goods in interstate commerce. The employment contract therefore does not fall within § 1's exclusion."
134 F.3d at 1060-61. See, also, Albert v. National CashRegister Co., 874 F. Supp. 1324 (S.D.Fla. 1994), in which a Florida federal district court came to the same conclusion in 1994.
[6] See, also, Rudolph v. Alamo Rent A Car, Inc., 952 F. Supp. 311
(E.D.Va. 1997), which questioned the vitality of Miller MetalProducts and foretold the decision of the Fourth Circuit inO'Neil.